**UNITED STATES of America, Appellee,**

v.

**Hector GONZALEZ,
Defendant–Appellant.**

**No. 338, Docket 90–1283.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1990.

Decided Jan. 9, 1991.

Joel A. Brenner, East Northport, N.Y., for defendant-appellant.

Stephen C. Robinson, Asst. U.S. Atty. S.D. New York (Otto G. Obermaier, U.S. Atty., Debra Ann Livingston, Asst. U.S. Atty. S.D. New York, New York City, of counsel), for appellee.

Before CARDAMONE and MINER, Circuit Judges, and POLLACK, District Judge *.

CARDAMONE, Circuit Judge:

Hector Gonzalez appeals from a February 9, 1990 judgment of the United States District Court for the Southern District of New York (Ward, J.) following a jury trial that convicted him of tampering with—in this case murdering—an informant in viola-

tion of 18 U.S.C. §§ 1512(a)(1)(C) and 1111 (1988). Gonzalez also appeals from an April 29, 1990 order which, as a result of the tampering conviction, sentenced him to life imprisonment without parole. On this appeal we are asked for the first time to determine whether such sentence imposed on the 21–year–old appellant is mandated by the statute under which he was convicted, and whether it is within the constitutional bounds of the Eighth Amendment that proscribes the infliction of cruel and unusual punishment. Crime and punishment, as Dostoevsky memorably linked these concepts, presents today as it always has a dilemma in the use of criminal sanctions: how egregious must an offense be before the law may inflict—save for a sentence of death—the most extreme kind of sanction? Our principal discussion therefore focuses on murder and the imposition of a life sentence without parole.

## FACTS

In the spring and summer of 1989 the United States Attorney for the Southern District of New York and the U.S. Drug Enforcement Administration (DEA) conducted an investigation into a narcotics operation on the Lower East Side of Manhattan. On August 13, 1989 a confidential informant involved in the investigation, Felix Pichardo, was shot and killed in Brooklyn. The government arrested the defendant, Hector Gonzalez, and charged him with killing Pichardo to prevent him from giving information to the DEA regarding Gonzalez' narcotics activities.

The evidence at trial established that Pichardo had been arrested in 1988 for violation of federal narcotics laws, and subsequently agreed to plead guilty and cooperate by becoming a confidential informant for the DEA. Acting in that capacity, Pichardo arranged to purchase 700 grams of heroin on May 9, 1989 from David Delvalle and Nelson Arroyo, two men who were suspected of being involved in drug transactions with defendant Gonzalez, both of

* Honorable Milton Pollack, Senior Judge, United States District Court for the Southern District of   New York, sitting by designation.

whom were later arrested in Manhattan and charged with conspiracy to sell heroin. Pichardo was aiding federal officials as part of an on-going narcotics investigation focusing on 22 Jackson Street (Gonzalez' Manhattan residence). When Delvalle, just freed on bail, was walking with his girlfriend and two family members toward his home on New York's Lower East Side, he saw Gonzalez passing by on a motorcycle and flagged him down. Delvalle accused Gonzalez of setting him up; Gonzalez denied it and told Delvalle that Pichardo was the informant, adding that he thought Pichardo had marked him (Gonzalez) to be arrested next and that he was afraid Pichardo would "rat him out." Gonzalez then said he would kill Pichardo. Over the next two months, Gonzalez repeatedly told Delvalle of his intention to kill Pichardo.

Meanwhile, several months earlier in February or March 1989, Gonzalez had a meeting with Maximo Nunez, a drug dealer he had met through Pichardo. Gonzalez told Nunez not to contact Pichardo about any more drug deals, but to deal directly with him because Pichardo was an informant and not to be trusted. He gave Nunez a beeper number where he could be reached. These two kept in touch with each other and during one of their conversations, Gonzalez told Nunez he intended to kill Pichardo.

Pablo Morales testified that he was with Pichardo on the day of the murder—August 13, 1989—when Pichardo's beeper sounded and Pichardo left him to place a telephone call. Records produced at trial show a telephone call from Gonzalez' home number to Pichardo's beeper number at 4:01 p.m. on August 13. Upon returning, Pichardo told Morales he was waiting for someone. A little later, Gonzalez and an unidentified man arrived in a Nissan Pathfinder automobile.

Gonzalez, who was wearing a black sweater, black pants, a gold chain, and a gold Rolex, told Pichardo and Morales to follow the Pathfinder in Pichardo's car, and led them to South Fifth Street between Hooper and Hewes Street, in Brooklyn, where they stopped. When Pichardo got out to speak with Gonzalez, Morales stayed in the car. Pichardo went to the trunk of his car, took out a brown paper bag, and returned to talk to Gonzalez. Pichardo then walked back towards the trunk of his car still holding the brown bag. As he was putting the bag back into the trunk, Gonzalez pulled out a gun and shot him in the back of the head. At that, Morales jumped from the car, fled to a neighborhood grocery store and hid in the bathroom. The storekeeper told Gonzalez—who was in pursuit—that Morales had gone out the back door.

Maximo Nunez also saw defendant that same day. He described him as dressed in dark clothing and running down Hooper Street, where he saw him push the driver of a Nissan Pathfinder into the passenger seat and then drive the Pathfinder quickly around the corner. A Pathfinder was found abandoned several blocks from the murder scene. The day after the murder, Nunez called Gonzalez and asked him if he knew what happened "in the south." Gonzalez said he knew "it" was going to happen, and told Nunez: "do not call anybody else. I am now number one."

Alex Rodriguez, a delivery man, stated he was riding as a passenger in his delivery truck around 6:30 p.m. the day of the murder. While stopped at a traffic light he saw a man running down the street, but did not get a good look at him. The driver of the truck said: "Look at the guy with the gun," and Rodriguez saw a man he identified at trial as Gonzalez running past the truck holding a gun. Rodriguez testified that he saw Gonzalez cross in front of the truck and pass the gun to a man on the corner. The man on the corner threw the gun across the street into a vacant lot, where the police later recovered it. A bullet fired from the gun matched the one recovered from Pichardo's body. Both Delvalle and Arroyo identified the gun the police recovered as belonging to Gonzalez, though a latent print on the gun was not his.

Dennis Goodman, an inmate at Otisville prison, where Gonzalez was detained after his arrest, testified that Gonzalez told him

that he was in jail for murder, that he had made an appointment with an informant somewhere in Brooklyn, and that he had "hit" the informant in the head. Goodman said Gonzalez also told him that he had chased another man into a bodega (a store), and that he had carried a gun, but that it had been wiped clean of prints. Consistent with the descriptions given by Morales and Nunez, police testified that Gonzalez was wearing a gold chain with a medallion and a Rolex at the time of his arrest. These items, as well as $4,763 found on defendant at the time of his arrest, were admitted into evidence.

Upon the jury's returning a guilty verdict finding that Gonzalez had committed premeditated, first degree murder, he was sentenced to life imprisonment without parole. We affirm.

## DISCUSSION

### I  Life Sentence Without Parole

#### A. *Discretion under 18 U.S.C. § 1111*

■ Gonzalez contends the district court misread 18 U.S.C. § 1111 as affording it no discretion and requiring it to impose a life sentence without parole. The district court's interpretation of its authority under the Sentencing Guidelines and § 1111 presents a question of law that is reviewed *de novo. See United States v. Lara*, 905 F.2d 599, 602 (2d Cir.1990); *United States v. Stroud*, 893 F.2d 504, 506–07 (2d Cir. 1990).

Section 1111 provides that, "[w]hoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life...." 18 U.S.C. § 1111(b). Since the Supreme Court held the discretionary imposition of a death penalty unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), defendants convicted of first degree murder under § 1111 have automatically been sentenced to life imprisonment. *United States v. Donley*, 878 F.2d 735, 739 n. 8 (3d Cir.1989), *cert. denied,* —

U.S. ——, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990).

The issue posed is whether the passage of the Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 *et seq.* (1988) and 28 U.S.C. §§ 991–998 (1988), and the Sentencing Guidelines promulgated under that Act supersede the express terms of § 1111, and confer discretion on the sentencing court to impose a lesser sentence. In urging this proposition Gonzalez points to the Commentary to § 2A1.1 of the Guidelines—for which § 1111 is the underlying statute—as evidence that the Sentencing Reform Act's abolition of parole does not mean that the only sentence a judge may impose under § 1111 is life without parole.

The Commentary states that

1. The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for the "willful, deliberate, malicious, and premeditated killing" to which 18 U.S.C. § 1111 applies. However, the same statute applies when death results from certain enumerated felonies—arson, escape, murder, kidnapping.... Life imprisonment is not necessarily appropriate in all such situations.

    ....

*Background:* The maximum penalty authorized by 18 U.S.C. § 1111 for first-degree murder is death or life imprisonment. Prior to the applicability of the Sentencing Reform Act of 1984, a defendant convicted under this statute and sentenced to life imprisonment could be paroled.... Because of the abolition of parole by that Act, the language of 18 U.S.C. § 1111(b) (which was not amended by the Act) appears on its face to provide a mandatory minimum sentence of life imprisonment for this offense. Other provisions of the Act, however, classify this offense as a Class A felony ... for which a term of imprisonment of any period of time is authorized as an alternative to imprisonment for the duration of the defendant's life (*see* 18 U.S.C. §§ 3559(b), 3581(b)(1), *as amended*); hence, the relevance of the discussion in

Application Note 1, *supra*, regarding circumstances in which a sentence less than life may be appropriate for a conviction under this statute.

Guidelines § 2A1.1, comment. (n. 1) & backg'd (1989).

To make the following discussion more readily understandable we set forth the provisions of §§ 1111, 3559 and § 3581:

§ 1111. Murder

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by ... lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; ... or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) ....

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

§ 3559. Sentencing classification of offenses

(a) Classification.—An offense that is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is—

(1) life imprisonment, or if the maximum penalty is death, as a Class A felony;

(2) twenty-five years or more, as a Class B felony;

(3) less than twenty-five years but ten or more years, as a Class C felony;

(4) less than ten years but five or more years, as a Class D felony;

(5) less than five years but more than one year, as a Class E felony;

(6) one year or less but more than six months, as a Class A misdemeanor;

(7) six months or less but more than thirty days, as a Class B misdemeanor;

(8) thirty days or less but more than five days, as a Class C misdemeanor; or

(9) five days or less, or if no imprisonment is authorized, as an infraction.

(b) Effect of classification.—An offense classified under subsection (a) carries all the incidents assigned to the applicable letter designation, except that the maximum term of imprisonment is the term authorized by the law describing the offense.

§ 3581. Sentence of imprisonment

(a) In general.—A defendant who has been found guilty of an offense may be sentenced to a term of imprisonment.

(b) Authorized terms.—The authorized terms of imprisonment are—

(1) for a Class A felony, the duration of the defendant's life or any period of time;

(2) for a Class B felony, not more than twenty-five years;

(3) for a Class C felony, not more than twelve years;

(4) for a Class D felony, not more than six years;

(5) for a Class E felony, not more than three years;

(6) for a Class A misdemeanor, not more than one year;

(7) for a Class B misdemeanor, not more than six months;

(8) for a Class C misdemeanor, not more than thirty days; and

(9) for an infraction, not more than five days.

As the commentary to Guidelines § 2A1.1 notes, § 3559 classifies a conviction for murder in the first degree under § 1111 as a Class A felony. The letter grades assigned under § 3559 depend on the punishment to be imposed. Hence, the A felony status here is based on the maximum sentence of life imprisonment authorized under the statute: "An offense that

is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is—(1) life imprisonment, or if the maximum penalty is death, as a Class A felony." 18 U.S.C. § 3559(a)(1). Section 3581 establishes the sentence for Class A felonies at "the duration of the defendant's life or any period of time." Defendant's principal argument therefore is that the sentencing court could sentence him for "any period of time" less than life.

Analysis of the statutory argument begins with the observation that Congress would not logically leave in place its statutory scheme that assigned a penalty to the commission of an offense, classify the offense according to that penalty, and then use the same classification to assign a different penalty. If Congress desired to assign another or different penalty for first degree murder, it could readily have amended § 1111.

■ More logical is the conclusion that the "Class A" felonies to which § 3559 refers and those to which § 3581 refers are not identical categories. Legislative history indicates that § 3581 addresses only "the maximum periods for which a judge is authorized to sentence an offender in each ... category; they represent the [Judiciary] Committee's judgment as to the greatest period the Congress should allow a judge to impose for an offense committed under the most egregious of circumstances." S.Rep. No. 225, 98th Cong., 2d Sess. 114, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3297.

Section 3559, on the other hand, was enacted because many statutes, after describing the offense, already provided for a specific sentence. The Judiciary Committee did not believe amending each and every statute that provided for a' specific sentence in order to achieve conformity with the letter grade scheme of the Act was feasible at the time the Act was passed. Further, the Committee did not want to convey the misleading impression that it had been able to give individualized consideration to grading existing offenses. It therefore settled on "a general provision

such as section 3559 [as] preferable at this time." *Id.* at 3270. Nothing in the legislative history suggests it was Congress' plan that the mere letter grade designation of existing offenses would amend the minimum sentences provided for in those statutes. The Committee stated in fact, that it "postponed the restructuring of Federal offenses according to their relative seriousness." *Id.*

From this legislative history, it may be seen that § 3559 applies only to pre-existing statutes that already set forth specific sentences. Left to another day was the reconsideration of those sentences. It follows that § 3581 is meant to assign terms of imprisonment to all other offenses, *i.e.*, those statutes that did not set forth specific sentences, but only classified the offense as one or another type of felony or a misdemeanor. *See Donley*, 878 F.2d at 740 (the terms of imprisonment in § 3581(b) "were meant to apply only to those offenses that were assigned letter classifications in the statutes describing the offenses").

In *Donley*, the Third Circuit, relying on its conclusion that the two statutes do not group offenses into precisely the same categories, held that Congress did not aim to give courts discretion to reduce the sentence for first degree murder under § 1111 when it passed these statutes. The court noted that the two statutes do not address identical categories, using as an example the fact that "the two sections authorize different maximum penalties for the same [Class C] letter grade classification." *Id.* It thus reasoned that the statutes "were meant to apply to two different sets of Class C offenses." *Id.* As the Third Circuit's exploration of this complex statutory issue makes clear, the designation of an offense by a letter grade under § 3559 does not lead necessarily to the imposition of the sentence set forth in § 3581 for that letter grade.

■ The Guidelines themselves support our conclusion that the sentencing court has no discretion under § 1111 to impose a sentence other than life in prison for first-degree murder. Guidelines § 5G1.1 expressly adopts the minimum and maximum

sentences authorized in a particular statute as the Guidelines minimum or maximum in any case where the Guidelines sentence exceeds or falls below the statutory sentence. *United States v. Sharp*, 883 F.2d 829, 831 (9th Cir.1989). Although the commentary to Guideline § 2A1.1 speaks of death or life imprisonment as the "maximum" penalty available under the statute, those comments are used because the statute sets forth a (lesser) term of imprisonment than life for second degree murder, in addition to a term of life imprisonment for first degree murder. The Guidelines' reference to a "maximum" of life imprisonment does not imply a negative of the "minimum" set by statute. The language of the statute is clear—life imprisonment is the minimum sentence available for first degree murder under § 1111. Life imprisonment is therefore necessarily the Guidelines sentence as well. *See Mistretta v. United States*, 488 U.S. 361, 368, 109 S.Ct. 647, 652, 102 L.Ed.2d 714 (1989); 28 U.S.C. § 994(a).

Gonzalez further contends that the abolition of parole changes the calculus. It is true that a life sentence under the Sentencing Reform Act in almost every case will be a much harsher sentence than was a life sentence prior to the Act when the possibility of parole existed. But Congress did not inadvertently eliminate parole; it was an integral part of the Sentencing Reform Act's scheme. *See* S.Rep. No. 225, *reprinted in* 1984 U.S.Code Cong. & Admin. News at 3229–39. Congress could foresee its action would translate every life sentence into life imprisonment without possibility of parole, so that the term life sentence would be the reality.

To the extent that the commentary to § 2A1.1 indicates a result contrary to the one we reach, we read that commentary as only opening a door to the possibility that unpremeditated murders may incur a penalty less than life imprisonment. When the commentary speaks of "the relevance of the discussion in Application Note 1, *supra*, regarding circumstances in which a sentence less than life may be appropriate for a conviction under this statute," it refers to the example in which a felon indirectly and accidentally causes a death during the commission of a felony. We need not now decide whether life imprisonment is the minimum penalty for that sort of act for this case does not present it. The question before us implicates only the penalty for a premeditated murder in the first degree. As a consequence, there is no basis to conclude that the Sentencing Reform Act or the Guidelines granted any discretion to a sentencing court in a case of first degree murder under § 1111.

### B. *Cruel and Unusual Punishment under the Eighth Amendment*

We turn next to defendant's assertion that his sentence under § 1111 violates the Eighth Amendment's prohibition against cruel and unusual punishment because it does not allow for an individualized assessment of the offender. For support, defendant cites *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), which held the mandatory imposition of the death penalty unconstitutional under circumstances where the sentencing court was not permitted to consider possible mitigating factors at defendant's sentencing because of his status of serving a life sentence at the time of the offense. The obvious distinction between *Sumner* and the instant case is that the analysis here is of the mandatory imposition of life imprisonment, not capital punishment. We have previously ruled that in a noncapital case no due process right to individualized sentencing exists. *See United States v. Vizcaino*, 870 F.2d 52, 56 (2d Cir.1989).

■ Gonzalez urges that a life sentence without parole sentences him to a living death because no matter what he does in prison he can only leave there "in a coffin." Such an argument is not without substance, yet a sentence of life imprisonment without parole is not an irreversible deprivation in the same manner as a sentence of death. *See Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980). The Supreme Court's close and careful review of how the death penalty may be imposed describes the difference between the death penalty and all other

punishments: "Death is a unique punishment in the United States. In a society that so strongly affirms the sanctity of life, not surprisingly the common view is that death is the ultimate sanction." *Furman,* 408 U.S. at 286, 92 S.Ct. at 2750 (Brennan, J., concurring). Individualized assessment of a defendant in noncapital cases, in contrast to capital cases, has been based "not on constitutional commands, but on public policy enacted into statutes." *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). Thus, the Eighth Amendment does not compel individualized assessment of a defendant facing a mandatory sentence of life imprisonment without parole.

Discussion now turns to exploring the proportionality argument. In several cases decided in the 1980's the Supreme Court wrestled with the issue of proportionality under the Eighth Amendment. Underlying the discussion is the analysis contained in the leading case of *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). In that case, Weems was convicted of falsifying a public and official document, and was sentenced to 15 years imprisonment. The Court graphically described the statute under which Weems was convicted as requiring confinement "for twelve years and one day, a chain at the ankle and wrist of the offender, hard and painful labor, ... [and, following release,] tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity, and deprive of essential liberty." *Id.* at 366, 30 S.Ct. at 548. After reviewing the history of the Eighth Amendment and quoting Mr. Justice Story as ascribing its genesis to the English Bill of Rights of 1688, *id.* at 371, 30 S.Ct. at 550, the Court goes on to say "[i]n the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be." *Id.* at 373, 30 S.Ct. at 551. It showed through historical analysis how all the old forms of torture and barbarous conduct, whipping, pillory, burning, quartering and the like came gradually to be considered by courts in this country to fall within the Eighth Amendment's prescription against cruel and unusual punishment. The Court then declared the Philippine statute under which the punishment was imposed unconstitutional "both on account of the[ ] degree and kind [of punishments it imposed]." *Id.* at 377, 30 S.Ct. at 553. But it added this caveat: the "function of legislature is primary." *Id.* at 379, 30 S.Ct. at 554. There is a certain subordination of the judiciary to the legislature, and its presumptions of legality are not lightly to be interfered with, nor attacked based on judges' notions of right and wrong. The only limitations on the legislature are constitutional ones. *Id.*

In 1980 the Supreme Court had before it a Texas two-time recidivist who, upon a third felony conviction, received a mandatory life term sentence. It held the sentence did not violate the cruel and unusual punishment provision of the Eighth Amendment. *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). A few years later a South Dakota recidivist with six prior felony convictions received on his seventh felony conviction for altering a worthless $100 check a life term without possibility of parole. The Supreme Court reversed the sentence focusing on its disproportion to the crime committed. *See Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

Distinctions exist between these two cases: for example, in *Rummel* the prisoner was eligible for parole in 12 years; that possibility did not exist in *Solem.* Although difficult to harmonize, we may nonetheless glean some applicable principles from their teachings. The final clause of the Eighth Amendment—"nor cruel and unusual punishments inflicted"—prohibits not only the barbaric punishment addressed in *Weems,* but also sentences grossly disproportionate to the offense committed. One example all the members of the Supreme Court agreed upon was that were parking overtime to subject a person to life imprisonment, the proportionality principle would come into play. *See Solem,* 463 U.S. at 290 n. 17, 310–11 nn. 2 & 3, 103 S.Ct. at 3010 n. 17, 3020–21 nn. 2 & 3; *Rummel,* 445 U.S. at 274 n. 11, 288,

100 S.Ct. at 1139 n. 11, 1146 (Powell, J., dissenting).

These decisions instruct that only in a rare case should a court engage in reviewing disproportionality of sentences because the legislature's line drawing—when it fixes terms for imprisonment—is primary and presumptively valid. A legislative body may conduct hearings, take surveys, and hear a broad range of public opinion in determining what is appropriate punishment. Hence, such a body is better equipped to determine what sentences should be imposed for given offenses. Plainly, the Supreme Court established no general rule of appellate review for sentences. Instead, appellate examination is confined to deciding whether a sentence reviewed is within constitutional limits. *See Solem*, 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16. It might be safely said that when the offense causes less revulsion than the punishment imposed for its commission, as it did in *Weems*, then grossly disproportionate punishment has been inflicted in violation of the Eighth Amendment.

In light of *Solem, Rummel*, and *Weems*, it seems clear that there is no valid proportionality claim in the case at hand. The Eighth Amendment condemns only punishment that shocks the collective conscience of society. A sentence of life without parole for a drug dealer and killer, even a first-time offender, is not so disproportionate to the offense that it shocks the public's conscience. *See United States v. Aiello*, 864 F.2d 257, 265 (2d Cir.1988) (judge did not abuse his discretion by sentencing defendant to life without parole where defendant was "large supplier of hard drugs"); *Terrebonne v. Butler*, 848 F.2d 500, 505–507 (5th Cir.1988) (mandatory sentence of life without parole given to 21 year old heroin addict held constitutional despite court's expressed sympathy that "the tiger trap has sprung on a sick kitten"), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989). Consequently, the imposition under 18 U.S.C. § 1111 of a life sentence without parole in this case is not so grossly disproportionate to the of-fense as to constitute cruel and unusual punishment under the Eighth Amendment.

## II Sufficiency Challenges

The sufficiency of the evidence supporting the jury's verdict on the elements of guilt, intent implicated in the murder, and the venue where the action was tried are next to be discussed. An appellant challenging the sufficiency of the evidence bears a very heavy burden, *see United States v. Torres*, 901 F.2d 205, 216 (2d Cir.1990); *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986), since the evidence and all inferences and ambiguities are viewed in a light most favorable to the government. The evidence is not viewed piecemeal, but as a whole, *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and the verdict must be sustained if, viewing the evidence in that manner, there is substantial evidence to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). For those reasons, a conviction must be upheld where any rational trier of fact could find the essential elements of the crime had been proven beyond a reasonable doubt. *See United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986).

The first issue is whether there was sufficient evidence to prove beyond a reasonable doubt that Gonzalez killed Pichardo. The proof, already related, consisted of one eyewitness to the murder, two witnesses who saw Gonzalez run from the scene of the crime, identification of the murder weapon, telephone records of the call used to lure the victim to the place where he was killed, and Gonzalez' threats made in the presence of several witnesses that he was going to kill Pichardo. This is more than sufficient proof to support the jury's verdict.

The next issue is whether the evidence supports the finding that the defendant shot Pichardo with the requisite intent. A defendant is guilty of tampering with a witness or informant only if he committed the act with

intent to—(A) prevent the attendance or testimony of any person in an official proceeding; (B) prevent the production of a record, document, or other object, in an official proceeding; or (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings.

18 U.S.C. § 1512(a)(1) (1988). The prosecutor is not required to prove the defendant's state of mind with respect to the elements of the federal nature of the proceeding, the judge, agency, or law enforcement officer. 18 U.S.C. § 1512(f) (1988); *see United States v. Scaife*, 749 F.2d 338, 348 (6th Cir.1984).

◼ Gonzalez' argument that there was no testimony that he was afraid Pichardo would "rat him out" to the DEA—as opposed, for example, to some state or local law enforcement agency—therefore, is meritless, as is the similar point that he might have killed Pichardo for some reason other than to prevent the communication of evidence against him. *See United States v. Chang An–Lo*, 851 F.2d 547, 555 (2d Cir.) (evidence sufficient to sustain conviction for drug trafficking since rational juror could conclude defendant's statements indicated his participation in heroin conspiracy, not his desire to get involved in legal gambling operation as defendant claimed), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). The evidence amply proved defendant intended to kill Pichardo to prevent him from communicating information to the DEA. Proof included Delvalle's testimony that Gonzalez thought Pichardo had marked him, as well as other statements admitted into evidence that Gonzalez knew Pichardo was an informant.

### III Venue

#### A. *Standard of Proof*

◼ The next question presented is whether the government was required to prove venue in the Southern District of New York beyond a reasonable doubt.

Subsection (h) of § 1512 states that a witness tampering prosecution may be brought "in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred." As a general rule, "[v]enue turns on whether any part of the crime was committed within the district, and the government need only prove venue by a preponderance of the evidence." *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977). Precedent does not support defendant's contention that venue under § 1512 is subject to a higher burden of proof. He relies on *United States v. Potamitis*, 739 F.2d 784 (2d Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984), which is of no help to him, for it correctly articulates the standard as preponderance of the evidence, even though in that case the trial court improperly instructed the jury that venue must be proven beyond a reasonable doubt under § 1512. *Id.* at 791.

The history of the venue statute prevents reading into it any design that proof of proper venue is subject to the highest standard of proof. Enacted in 1988, six years after the substantive provisions of § 1512 (of the Victim and Witness Protection Act of 1982) were passed, the legislative history of subdivision (h) reveals that Congress enacted the venue section because there was a split in authority on the question of where proper venue was laid under 18 U.S.C. § 1512 and under a related statute, 18 U.S.C. § 1503. Some circuits chose the district where the acts were committed and some selected the district where government proceedings were affected. *See United States v. Frederick*, 835 F.2d 1211, 1213–14 (7th Cir.1987), *cert. denied*, 486 U.S. 1013, 108 S.Ct. 1747, 100 L.Ed.2d 210 (1988); *United States v. Reed*, 773 F.2d 477, 484–85 (2d Cir.1985) (collecting cases).

Congress enacted subdivision (h) of § 1512 to resolve the division in authority, so that "if a witness scheduled to testify in a District of Columbia trial is killed while

dining at a restaurant in Maryland, the prosecution for obstruction of justice could take place in either Maryland or in the District of Columbia." 134 Cong.Rec. S7446–01 (June 8, 1988) (statement of Sen. Kennedy). Simply because Congress felt compelled to clarify the proper venue for prosecution under these statutes did not thereby elevate the standard of proof needed to establish that prosecution was laid in the proper district.

■ In any event, Gonzalez waived any objection to the preponderance of the evidence instruction because he failed to state an objection before the jury retired. Fed. R.Crim.P. 30; *United States v. Friedman,* 854 F.2d 535, 555–56 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). Trial counsel did comment that one of the factual issues to be considered by the jury is perhaps that telephone call "which is a fact that would have to be established beyond a reasonable doubt." Standing alone this statement might have been enough to preserve an objection, but immediately after he made it, defense counsel agreed to a modification of the charge eliminating the reference to the telephone call, but leaving the burden of proof language in the charge at a preponderance of the evidence. Further, when the trial judge asked counsel if he had any objections, though counsel stated he had several, he did not voice any to the venue charge as modified. The objection was therefore waived.

### B. *Official Proceeding*

■ The next matter considered is whether the investigation within the Southern District constituted an "official proceeding" within the meaning of § 1512(h). Defendant's first argument, that official activity beyond the investigatory level is mandated because §§ 1512(a)(1)(A) and (a)(1)(B) refer to the production of records or documents and to the attendance of persons, is meritless. Section 1512(a) is written in the disjunctive—the action is punishable if it violates subsection (A) *or* subsection (B) *or* subsection (C), and the elements

of one subsection have no bearing on the elements of another.

Yet, defendant's second "official proceeding" argument has some plausible merit, in part because of the added venue section that does not mirror all of the substantive provisions of § 1512. Gonzalez was convicted under § 1512(a)(1)(C), which makes illegal the killing of a person with intent to prevent the communication of information relating to the commission of a Federal offense. The statute does not refer to an "official proceeding." The venue provision, on the other hand, contemplates the existence of some "official proceeding," defined as "a proceeding before a Federal Government agency which is authorized by law." 18 U.S.C. § 1515(a)(1)(C) (1988).

■ The Victim and Witness Protection Act was enacted to protect those persons with knowledge of criminal activity who are willing to confide in the government. *See United States v. DiSalvo,* 631 F.Supp. 1398, 1402 (E.D.Pa.1986), *aff'd,* 826 F.2d 1057 (3d Cir.1987); *United States v. Hernandez,* 730 F.2d 895, 898 (2d Cir.1984). Consistent with this purpose, Congress explicitly overruled case law requiring that an official proceeding be pending in order for a defendant to be subject to prosecution for witness tampering. *See* 18 U.S.C. § 1512(e)(1) (1988); *United States v. Vesich,* 724 F.2d 451, 454–55 (5th Cir.1984); *DiSalvo,* 631 F.Supp. at 1402.

In enacting § 1512(h), Congress surely did not aim to narrow the reach of the Victim and Witness Protection Act. Were we to adopt defendant's reading of the venue provision and hold that some official proceeding beyond the investigatory stage be pending or contemplated, the effect would be to read out of the statute much of the criminal activity ostensibly covered by § 1512(a)(1)(C). That portion of the statute generally extends protection to individuals willing to furnish information regarding a federal offense. We decline to rule that a person who kills a witness while an official proceeding is pending or in progress cannot escape prosecution, but that same person may escape prosecution if he happens to commit the same murder during the inves-

tigatory stage. That loophole is one Congress has already closed. *Cf. Hernandez,* 730 F.2d at 898 (§ 1512 explicitly extends protection to "potential" witnesses, whereas former § 1503 did not).

As a consequence, in construing § 1512(h) in conjunction with § 1512(a)(1)(C), we read the term "official proceeding" broadly in order to effect Congress' purpose in passing it. Here, there was an ongoing investigation in Lower Manhattan, where the narcotics activity itself occurred. That was where Arroyo and Delvalle were arrested for selling heroin. Gonzalez' purpose in killing Pichardo was to affect this investigation in Lower Manhattan. To the extent that § 1512(h) provides for venue in the place where the act was intended to have an effect—that is to say, to interfere with the government's attempt to ferret out and prosecute criminal wrongdoing—Lower Manhattan was that place in this case. *See Frederick,* 835 F.2d at 1214 ("We view the assault in the present case not just as an assault upon an individual victim but as an assault upon the grand jury ... and upon the judicial process.").

We hold therefore that the proper standard of proof of venue under § 1512 is a preponderance of the evidence, and conclude that venue was properly laid in the Southern District of New York where the narcotics investigation was taking place at the time of the murder.

### C. *Sufficiency of the Venue Evidence*

■■■ Gonzalez contends that even if the burden of proof is a preponderance of the evidence, and even if venue was proper in the Southern District of New York, there was insufficient evidence to support the jury's finding of venue. To the contrary, there was enough evidence to support the finding. Agent Austin testified the investigation occurred in Lower Manhattan, and Delvalle and Arroyo, who were working with Gonzalez, were arrested there. It was in Lower Manhattan that Gonzalez told Delvalle he would kill Pichardo and accused Pichardo of being an informant. Most significant, Gonzalez lived in Lower Manhattan, and made the telephone call that lured the victim to the scene of the crime from his Manhattan residence. The instructions and verdict as to venue were therefore entirely supportable.

### IV Other Contentions

■■■ Several evidentiary issues and a jury instruction that defendant insists is objectionable remain for consideration. None warrant extended discussion. The admission of the chain, medallion, and Rolex watch Gonzalez was wearing at the time of his arrest supported Morales' testimony describing the suspect as wearing these articles the day of the murder. The trial court did not exceed its wide discretion in admitting either these items or the testimony identifying the murder weapon into evidence. *See United States v. Moon,* 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). Nor did their receipt into evidence or the admission of the $4,763 in cash found on Gonzalez when he was arrested, which tended to demonstrate that he was a major drug dealer with a good motive for silencing Pichardo, transgress Fed.R.Evid. 404(b). *Cf. United States v. Tramunti,* 513 F.2d 1087, 1105 (2d Cir.) (possession of large amounts of unexplained cash tends to prove narcotics activity), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *see United States v. Everett,* 825 F.2d 658, 661 (2d Cir.1987), *cert. denied,* 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988).

■■■ Finally, Judge Ward instructed the jury that the case was important to the defendant and that it was important to the government too because "the enforcement of the criminal law is a matter of prime concern in the protection of the public interest." Although we have held such a charge regarding the impact on the public of a jury's verdict serves "no useful purpose," *United States v. Terry,* 702 F.2d 299, 313 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), use of such a charge is not generally reversible error, particularly where, as here, there is overwhelming evidence of guilt. *Id.; see United States v. Barlin,* 686 F.2d

81, 91, 93 (2d Cir.1982) (similar comment by prosecutor not reversible error where evidence of guilt "strong").

## CONCLUSION

The judgment of the district court is affirmed.