UNITED STATES of America, Appellee,

v.

Carlos LOPEZ, also known as Charlie Chan, also known as Chan; Rafael Lopez, also known as Tito, Defendants–Appellants.

Docket Nos. 02–1746(L), 02–1748(CON).

United States Court of Appeals, Second Circuit.

Argued: Jan. 23, 2004.

Decided: June 9, 2004.

Kelly T. Currie and Christina B. Dugger, Assistant United States Attorneys (Susan Corkery, Assistant United States Attorney, on the brief), for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee.

Lawrence Mark Stern, New York, NY, for Defendant–Appellant Carlos Lopez.

Daniel M. Felber, Balsam Felber & Goldfield, New York, NY, for Defendant–Appellant Rafael Lopez.

Before: NEWMAN, CALABRESI, and B.D. PARKER, Circuit Judges.

Judge NEWMAN dissents in a separate opinion.

B.D. PARKER, JR., Circuit Judge.

■ Carlos Lopez and his brother, Rafael Lopez, appeal from judgments of conviction entered by the United States District Court for the Eastern District of New York (John Gleeson, *Judge*). Following a two-week trial, a jury convicted both defendants of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count I) and conspiracy to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846 (Count II). The

jury also convicted Carlos Lopez of obstruction of justice murder in violation of 18 U.S.C. § 1512(a)(1)(C) (Count III). The District Court subsequently sentenced Carlos and Rafael Lopez principally to concurrent terms of life imprisonment on each of the counts for which they were respectively convicted. Both appeal, raising various challenges to their convictions and sentences. We write solely to explain our reversal of Carlos Lopez's conviction of obstruction of justice murder on the basis of insufficiency of the evidence, and we affirm as to all other issues raised in this appeal in a summary order issued with this opinion.[1]

## BACKGROUND

In early 1999, the Federal Bureau of Investigation and the New York City Police Department learned through a cooperating witness, Victor Cruz, that Carlos Lopez murdered an individual named Edward Montalvo in 1991 and that from 1989 through 1996 Lopez led a violent crew of crack cocaine dealers operating principally in the vicinity of a flower shop in the East New York section of Brooklyn, New York. Other leaders of the organization included his brother, Rafael Lopez, and Jose Salcedo.

With respect to the murder of Montalvo (the sole focus of this opinion), NYPD Officer Brenda Soto–Ramos testified at trial that, on August 17, 1991, she took a complaint from Montalvo, who reported that he had been threatened at gunpoint by Lopez. Soto–Ramos testified that Montalvo provided her with Lopez's nick-

name, "Charlie," and with a detailed physical description.

In addition, NYPD Officer Brian Connolly testified that, on the following day, he went to Montalvo's home, where Montalvo lodged another complaint against Lopez. In that complaint, Montalvo again provided a detailed description of Lopez, renewed his complaint about Lopez's prior threat, and stated that Lopez had returned that day with another man, that both were armed and that both had threatened him. Montalvo also informed Connolly that Lopez could be found at the corner of Pennsylvania and Flatlands Avenues, the location of a flower shop from which the defendants ran their narcotics operation.

After receiving this information from Montalvo, Connolly went to the flower shop and found Lopez sitting on a milk crate. After identifying Lopez, Connolly searched the vicinity and discovered two loaded handguns in the milk crate. Connolly then arrested Lopez for criminal possession of the weapons and menacing.

Following Lopez's arrest, the Kings County District Attorney's office decided not to prosecute him for criminal possession of the guns and, instead, charged him with the less serious crimes of assault, menacing, and attempted criminal mischief. Montalvo was present when the decision was made not to charge Lopez with the gun crimes and nervously reacted to that decision, exclaiming that "they're going to get out and they'll kill me." In an effort to ensure his safety, on August 19, the day after Lopez's arrest, Montalvo ob-

---

1. Although the reversal of Carlos Lopez's conviction on Count III will have no effect on the length of his imprisonment because of the concurrent life sentences he received on Counts I and II, we must still consider the validity of his conviction on Count III since a special assessment was imposed separately on

that count, rendering the "concurrent sentence doctrine" inapplicable. *See Ray v. United States*, 481 U.S. 736, 737, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987); *United States v. Mauro*, 80 F.3d 73, 76 (2d Cir.1996); *United States v. Griffin*, 884 F.2d 655, 656 (2d Cir.1989).

tained a temporary order of protection against Lopez from a state court.

After he was released from police custody, Lopez complained to fellow members of his drug organization that Montalvo was bringing "heat," or police presence, to the flower shop and that Montalvo intended to testify against him in state court criminal proceedings. Salcedo testified at trial that Lopez repeatedly told him that Montalvo had told the police about the threats, that Montalvo was making him and the flower shop drug sale location "hot," and that he had to "get rid" of him. Another associate of Lopez, Andre Eugene, similarly testified that Lopez asked him in the summer of 1991 to kill Montalvo because Montalvo had caused Lopez's arrest for possessing firearms.

The government's trial evidence established that Lopez murdered Montalvo. On August 30, Lopez enlisted the aid of two members of the flower shop organization, one acting as a getaway driver and the other as a lookout, and went to Montalvo's apartment building. Lopez waited in the stairwell on the floor where Montalvo's apartment was located, and when Montalvo came out of his apartment, Lopez approached him in the hallway and shot him repeatedly. Lopez subsequently described to other flower shop members how he had murdered Montalvo.

In April 2001, a grand jury indicted Lopez for, among other things, the obstruction of justice murder of Montalvo in violation of 18 U.S.C. § 1512(a)(1)(C), a count on which he was subsequently convicted at trial. Lopez appeals.

## DISCUSSION

■ Lopez contends that the evidence at trial was insufficient to convict him under section 1512(a)(1)(C), which makes it unlawful to commit murder to prevent communications to a federal official about a federal crime. In challenging the sufficiency of the evidence, Lopez bears a "heavy burden." *United States v. Diaz*, 176 F.3d 52, 89 (2d Cir.1999); *accord United States v. Romero*, 54 F.3d 56, 61 (2d Cir.1995). In reviewing such a challenge, we must "view the evidence, whether direct or circumstantial, in the light most favorable to the government and credit every inference that could have been drawn in its favor." *Diaz*, 176 F.3d at 89; *accord Romero*, 54 F.3d at 61. Moreover, we "assess the evidence not in isolation but in conjunction ... and the convictions must be affirmed, so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *Diaz*, 176 F.3d at 89 (internal citation omitted); *accord Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir.1994). In other words, a conviction will be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original).

Lopez contends that, at most, the evidence demonstrated his intention to obstruct a *state* investigation and that the government adduced no evidence that the murder might impact a *federal* investigation because no such investigation existed. The government maintains that it established the requisite federal nexus under section 1512(a)(1)(C) because it proved that Lopez committed a crime punishable under federal as well as state law, and, since Montalvo repeatedly turned to the local police for personal security, it is reasonable to assume that he might eventually have turned to federal law enforcement officials. We believe that the proof was inadequate to establish a violation of the

statute, though for reasons that differ from those urged by Lopez.

We begin our analysis with the text of the statute. Specifically, section 1512(a)(1)(C) makes it unlawful to kill or attempt to kill another person "with intent to ... prevent the communication by any person to a law enforcement officer ... of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C). Section 1515 defines a "law enforcement officer" as "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant." *Id.* § 1515(a)(4). Section 1512(g) further provides that in a prosecution for an offense under section 1512, "no state of mind need be proved with respect to the circumstance ... that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant." *Id.* § 1512(g)(2).

▮ We previously have explained that, because section 1512(g) expressly does not require that the government prove a defendant's "state of mind" with respect to the federal employment of the law enforcement officer, it is irrelevant that a defendant only intends to prevent the victim from speaking with local or state, as opposed to federal, law enforcement officers. *Diaz,* 176 F.3d at 90–91; *United States v. Gonzalez,* 922 F.2d 1044, 1054 (2d Cir. 1991). As we made clear in *Diaz,* " 'the government is not obligated to prove that the defendant knew or intended anything with respect to this federal involvement.' "

176 F.3d at 91 (quoting *United States v. Bell,* 113 F.3d 1345, 1349 (3d Cir.1997)).[2] Therefore, we reject Lopez's argument that the evidence was insufficient because it proved only his intention to obstruct a local investigation.

▮ We also reject Lopez's contentions that a federal investigation must be underway or that Montalvo must have been willing or available to cooperate with federal officials. As we held in *Romero:*

> [T]he government did not need to offer proof that [the victim] was willing to cooperate or that an investigation was underway. Rather, the statute is directed at the "intent to prevent ... communication" with federal authorities. *See* 18 U.S.C. § 1512(a)(1)(C). The government need prove only an intent to kill for the purpose of interfering with communication with federal law enforcement officials. The victim need not have agreed to cooperate with any federal authority or even to have evinced an intention or desire to so cooperate. There need not be an ongoing investigation or even any intent to investigate. Rather, the killing of an individual with the intent to frustrate the individual's possible cooperation with federal authorities is implicated by the statute.

54 F.3d at 62.

However, *Romero* ultimately is of limited guidance here because it involved evidence that the defendant and his criminal organization "had become suspicious that [the victim] was cooperating with *federal* authorities." 54 F.3d at 59 (emphasis added). Specifically, the defendant had learned that an indictment had been filed in federal court, charging him and other members of his organization with narcotics

---

**2.** Although *Diaz* addressed subsection (b)(3) of section 1512, the reasoning is applicable here because the elements of subsections (b)(3) and (a)(1)(C) are, as we explained in *Diaz,* 176 F.3d at 91, sufficiently similar.

and RICO violations. The defendant and his organization also had learned that the victim had not been named in that indictment, had apparently been released promptly each time he was arrested, and had attempted to involve an organization member in narcotics-related conversations. *Id.* at 58–59. We held that this evidence constituted a sufficient evidentiary predicate for the jury's conclusion that the defendant committed murder to prevent the victim's possible cooperation with federal authorities. *Id.* at 62.

In the absence of the type of evidence found sufficient in *Romero* to establish the requisite federal nexus, the government contends that it was established here by evidence that Montalvo reported Lopez to the local police on more than one occasion, which resulted in his arrest for gun possession and menacing, that Lopez was motivated to kill Montalvo to prevent him from bringing police to the flower shop, and that Lopez had stipulated that his possession of firearms on the date of his arrest would have constituted a federal offense. In other words, the government contends that a federal nexus was established by proof that a federal crime was committed and that Montalvo was willing to cooperate with the local police. According to the government, nothing more is required to establish the federal nexus.

We cannot agree that this evidence was sufficient to prove obstruction of justice murder in violation of section 1512(a)(1)(C). In *Diaz*, we adopted the Third Circuit's formulation of the government's burden of proof, explaining that

"the ·government must prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer, but that the government is not obligated to prove that the defendant knew or intended anything

with respect to this federal involvement.... *[T]he government may carry this burden by showing that the conduct which the defendant believed would be discussed in these communications constitutes a federal offense, so long as the government also presents 'additional appropriate evidence.'* "

176 F.3d at 91 (quoting *Bell*, 113 F.3d at 1349) (emphasis added and alteration in original). Because the government seeks to carry its burden in this case by showing that the underlying conduct to be discussed involved a federal offense, it therefore must also present "additional appropriate evidence." *Id.*

Examples of "additional appropriate evidence" include proof that the defendant had "actual knowledge of the federal nature of the offense" or proof that "there was a federal investigation in progress" at the time of the murder. *United States v. Stansfield*, 101 F.3d 909, 918 & n. 4 (3d Cir.1996); *see also Bell*, 113 F.3d at 1349–51 & n. 4 (expressing no opinion as to what additional types and what quantum of evidence satisfy the "additional appropriate evidence" standard, "which by its nature will require careful, case-by-case analysis"). In *Diaz*, for instance, we found the evidence sufficient because the defendant intended to prevent the victim from communicating with local officials about a federal offense, *and* that the defendant knew federal officials could record his telephone conversations that he conducted from federal prison with another member of his gang regarding "disciplin[ing]" the victim, *and* that during the relevant time period "federal authorities were in fact working closely with local police on a massive federal investigation of the [defendant's] gang's drug activities." 176 F.3d at 90–91. And in every other case in this or in any other circuit that has addressed this issue and affirmed a conviction there similarly

has been at least *some* evidence of federal involvement beyond the underlying federal crime to be discussed with the federal official. *See, e.g., Romero,* 54 F.3d. at 59 ("For a number of reasons, members of Romero's organization had become suspicious that Tyson was cooperating with federal authorities."); *Gonzalez,* 922 F.2d at 1046–47, 1053–54 (involving federal offense and investigation by the federal Drug Enforcement Administration); *Bell,* 113 F.3d at 1347, 1350 (involving federal offense and investigation by task force comprised of local, state, and federal investigators); *Stansfield,* 101 F.3d at 919 (involving federal offense and federal investigation); *United States v. Leisure,* 844 F.2d 1347, 1364 (8th Cir.1988) (involving evidence that victim would " 'turn over and talk to the FBI' ").

Where there has been no such federal involvement, however, other courts have found the evidence insufficient. *See, e.g., United States v. Causey,* 185 F.3d 407, 422–23 (5th Cir.1999). Such cases have been, and likely will be, rare. As we have explained, after all, "the killing of an individual with the intent to frustrate the individual's *possible* cooperation with federal authorities is implicated by the statute." *Romero,* 54 F.3d at 62 (emphasis added). Yet there must be *evidence*—not merely argument—of such a possibility. In other words, the government must adduce evidence from which a rational juror could infer that the victim *plausibly* might have turned to federal officials.

Here, the government has adduced no such "additional appropriate evidence." All the government proved was that conduct punishable under both state and federal law was involved and that Montalvo was willing to communicate with *local* authorities. The government did show that Montalvo feared for his life after the district attorney declined to pursue more serious charges. But even after that decision, Montalvo did not turn to federal officials; instead, he returned to *local* authorities for a protective order. There simply is no evidence that, despite the passage of over ten days between the issuance of the protective order and his murder, Montalvo ever turned to, or gave so much as a moment's thought of turning to, federal officers, or that federal agents were otherwise involved. The government provided no evidence, for example, that a federal investigation was underway, that federal authorities were in any way involved, that Lopez knew of the federal nature of his offense at the time he murdered Montalvo, or that Montalvo intended to communicate or anticipated communicating with federal authorities. *See, e.g., Causey,* 185 F.3d at 422–23. It is always possible that Montalvo someday "might" have turned to federal officials; but the range of things he "might" do is limitless, and no evidence in the record connects this possibility with reality. On these facts, even drawing all reasonable inferences in the government's favor, we hold that a reasonable jury could not conclude that Lopez killed Montalvo to prevent his communication to a federal law enforcement officer. Accordingly, we reverse Lopez's conviction on Count III.

## CONCLUSION

For the foregoing reasons, as well as the reasons stated in the accompanying summary order, the judgment of the District Court is affirmed in part and reversed in part.

JON O. NEWMAN, Circuit Judge, dissenting.

Edward Montalvo reported to New York City police officers that Carlos Lopez, a previously convicted felon, had threatened him with a gun, conduct that violated state and federal law. When Montalvo learned

that the local prosecutor would not bring gun charges against Lopez, but only less serious charges, he told the prosecutor that Lopez would get out and kill him (Montalvo). Lopez knew that Montalvo was informing on him. Montalvo was so concerned for his safety that he obtained a temporary protective order. Eleven days after learning that serious charges would not be brought against Lopez by local authorities, Montalvo was murdered by Lopez.

I respectfully dissent from the Court's ruling that the evidence was insufficient to permit a reasonable jury to convict Lopez of killing Montalvo to prevent him from communicating about a federal offense to a federal officer. Once he learned that *local* authorities would not put Lopez away for a long time, Montalvo could reasonably be expected to report Lopez's criminal conduct to *federal* authorities. A jury could conclude that it was *likely* this would have happened had Lopez not murdered Montalvo. In any event, a jury could conclude that communication with a federal official *might* have happened, which is all that is required to establish the federal jurisdictional element of the offense of obstruction-of-justice murder, in violation of 18 U.S.C. § 1512(a)(1)(C) (2000).

Section 1512(a)(1)(C) punishes anyone who kills another person with intent to prevent communication to a federal law enforcement official concerning a federal offense. However, Congress explicitly provided that in a prosecution for obstruction-of-justice murder "no state of mind need be proved with respect to the circumstance ... that the law enforcement officer is an officer or employee of the Federal Government ...." *Id.* § 1512(g)(2); *see United States v. Diaz*, 176 F.3d 52, 91 (2d Cir.1999) ("[T]he government is not obligated to prove that the defendant knew or intended anything with respect to this fed-eral involvement.") (internal quotation marks omitted). The Government must prove that the murder was committed with intent to prevent a communication about a federal offense to a law enforcement officer, and the officer who would have received the communication had the murder not occurred must be a federal officer, but the defendant need not know that the officer would be a federal officer. If in fact the defendant had in mind preventing the victim from communicating with a federal official, the crime is established even in the absence of evidence that the victim might actually have reported the defendant to a federal official. But in the more typical case, the evidence will show only that the defendant murdered the victim with intent to prevent communication with some law enforcement official, and the federal identity of that official, which the statute specifies is not part of the *mens rea* of the offense, can be shown by evidence of some plausible likelihood that the official would have been federal.

In the pending appeal, there is no dispute that Lopez, the defendant, had committed a federal offense—being a felon in possession of a gun. There is also no dispute that Montalvo, the victim, intended to and did report Lopez's gun possession to law enforcement officials. There is also no dispute that Lopez was aware that Montalvo was informing on him. The only disputed issue in the pending appeal is whether the evidence was sufficient for the jury to find that an officer who would have received Montalvo's communication had he not been murdered would have been a federal officer.

The appeal thus concerns the sufficiency of the evidence as to a federal jurisdictional element. We have regularly required only the barest evidence to meet the federal jurisdictional requirement of a criminal statute. "[I]f the defendants' conduct pro-

duces any interference with or effect upon interstate commerce, whether slight, subtle *or even potential,* it is sufficient to uphold prosecution under the Hobbs Act." *United States v. Perrotta,* 313 F.3d 33, 36 (2d Cir.2002) (emphasis added) (internal quotation marks omitted). "Our precedent requires the government make only a *de minimis* showing to establish the necessary nexus for Hobbs Act jurisdiction." *United States v. Fabian,* 312 F.3d 550, 554 (2d Cir.2002). There is no reason to be more rigorous as to the federal element for obstruction-of-justice murder than for a Hobbs Act violation. If anything, the test for the federal element as to obstruction-of-justice murder should be less rigorous. The Government's interest in making sure that those who intend to report federal offenses to a federal officer are not murdered is far more substantial than its interest in preventing robbery, extortion, or threat of violence that merely "affects" commerce, which is the offense under the Hobbs Act. *See* 18 U.S.C. § 1951.

There is an additional reason why the test for the federal element in a case of this sort should not be rigorous. The offense of murder to obstruct justice is an unusual criminal statute in that its *mens rea* element concerns the defendant's intent with respect to future conduct—a communication between the victim and a law enforcement officer (whose federal identity the defendant need not know) that the victim's murder prevented. Unlike the elements of typical criminal statutes that concern past conduct, the federal element of this statute concerns a prediction about the future. Such a statute requires consideration of the degree of likelihood required that the communication with a federal officer would have occurred, but for the murder.

Our Court has stated that the future contact between the victim and federal authorities, prevented by the defendant's conduct (here, murder) need only be an event that "might" occur. "Any knowing interference with a potential communication between an individual who *might* become a witness and federal law enforcement officials falls within the ambit of Section 1512." *United States v. Romero,* 54 F.3d 56, 62 (2d Cir.1995) (emphasis added). *Romero* cited with approval the Eighth Circuit's nearly identical formulation: " '[I]t is only necessary for a defendant to have believed that a witness *might* give information to federal officials ....' " *Id.* (quoting *United States v. Leisure,* 844 F.2d 1347, 1364 (8th Cir.1988)) (emphasis added). The Third and Seventh Circuits have used the same formulation: "[T]he defendant believed that the person ... *might* communicate with the *federal* authorities." *United States v. Stansfield,* 101 F.3d 909, 918 (3d Cir.1996) (first emphasis added); *United States v. Edwards,* 36 F.3d 639, 645 (7th Cir.1994) ("[T]he defendant *believed* that a person *might* furnish information to federal officials") (second emphasis added). In this case, the trial judge correctly charged the jury using the "might" standard: "Fourth, that the defendant believed that the victim might communicate with the federal authorities."

The Court's opinion asserts that *Romero* is "of limited guidance" because the evidence in that case strongly showed the defendant's suspicion of the victim's cooperation with federal officials. [p. 90] I see no reason to think that the *Romero* panel's statement of the governing standard, explicitly phrased and supported by substantial authority, is "of limited guidance" just because the evidence to meet that standard was substantial. In the pending case, the Court's opinion prefers the language from *United States v. Diaz,* 176 F.3d 52 (2d Cir.1999), which quoted the Third Circuit's opinion in *United States v. Bell,* 113

F.3d 1345, 1349 (3d Cir.1997), to the effect that where the Government relies primarily on evidence that the conduct to be discussed by the victim constitutes a federal offense, the Government must introduce "additional appropriate evidence." *Diaz,* 176 F.3d at 91 (internal quotation marks omitted).

However, *Diaz* does not purport to recede from the "might" language of *Romero.* Indeed, *Diaz* cites *Romero* with approval and points out that the obstruction statute reaches prevention of communications by "potential informants." *Id.* at 90. In *Diaz,* as in the pending case, there was no specific evidence that the informant had communicated with or would communicate with federal officers. Both cases involve the possibility of such a communication.

In fact, the possibility of a communication with a federal official was less likely for the victim in *Diaz* than for Montalvo. In *Diaz,* the victim had never communicated with any law enforcement officials. The possibility that he would contact a federal official rested on the double contingency that he might contact local police, as the defendant feared, *see Diaz,* 176 F.3d at 91, and that in the course of some possible future communications with local officials, the informant might communicate with any of the federal officials who were working with local police, *see id.* In the pending case, Montalvo had already contacted local police concerning Lopez's conduct, which violated federal law, and the rejection of significant prosecution by local authorities upon Montalvo's complaint that Lopez would kill him made his turning to federal officials a highly likely prospect, had he not been murdered eleven days later.

Of course, the statute requires something more than the theoretical possibility that the victim would have communicated with a federal official. When a person knows of conduct that constitutes a federal crime, the possibility, in that sense, always exists that he will tell some federal official. If that sort of possibility sufficed, the statute would be violated by anyone murdering a person who knew about a federal crime. The statute must be understood to mean that the possibility of a communication with a federal official has some plausibility. The evidence must provide the jury with some reason to believe that there was a realistic likelihood that the victim would have communicated with a federal official.

The Court asserts that "[a]ll the government proved was that conduct punishable under both state and federal law was involved and that Montalvo was willing to communicate with *local* authorities." [p. 92] That assertion ignores the following additional facts:

— Montalvo had already communicated with local authorities on several occasions concerning Lopez's criminal conduct;

— Montalvo knew that the local prosecutor had declined to prosecute Lopez on serious gun charges and instead filed only less serious charges, such as attempted criminal mischief;

— Montalvo unsuccessfully urged the prosecutor to file serious gun charges against Lopez, telling the prosecutor that if Lopez faced only minor charges, "they're going to get out and they'll kill me."

— Montalvo was so fearful of Lopez that he obtained a temporary protective order.

— Lopez knew that Montalvo was reporting him to local police. As he told a confederate, "whenever [Montalvo] sees me, he calls the cops. He ... is going to testify against me."

— Lopez told the confederate that he (Lopez) had to "get rid of" Montalvo.

Where, as here, there is evidence that the victim feared the defendant would kill

him, sought a protective order, urged a local prosecutor to bring serious charges against the defendant to prevent the defendant's early release, and was understandably alarmed when his plea for local prosecution on serious charges was rejected, it is entirely reasonable to conclude that he would then have turned to federal authorities and reported the defendant's federal criminal conduct.

The Court's attempt to argue the insufficiency of the evidence in this case by comparing it to other cases in which there was evidence of federal involvement [p. 91–92] is surprising in view of the Court's prior acknowledgment that the statute requires no evidence that a federal investigation must be underway [p. 90]. The issue is not whether the federal government was investigating the defendant. The issue is whether a jury could reasonably conclude that the victim, had he not been murdered, might have communicated with a federal officer. The existence of a federal investigation, if unknown to the victim, does not prove that the victim would have contacted a federal officer, and the absence of such an investigation does not indicate that he would not have contacted a federal officer, especially if, as in the pending case, the victim had a compelling reason to do so.

The Court's invocation of *Stansfield* is especially perplexing. The victim there has been in touch only with state and county officers, and, although a federal postal inspector has begun an investigation of the defendant's crime, there was no evidence that the victim knew of the inspector's involvement or had any reason to contact any federal officer. The evidence of obstruction-of-justice murder was deemed sufficient simply because of the possibility that the victim might have communicated with a federal officer. *Stansfield*, 101 F.3d at 919.

I have not been reluctant to uphold a claim that evidence is insufficient to support a conviction. *See United States v. Martinez*, 44 F.3d 148 (2d Cir.), *vacated*, 54 F.3d 1040 (2d Cir.1995); *id.*, 54 F.3d at 1049 (Newman, C.J., dissenting); *see also* Jon O. Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U. L. Rev. 979 (1993) (Madison Lecture). In this case, however, the evidence fully supports the jurisdictional element of possible communication by the victim with a federal officer, an element that inevitably involves a speculative prediction as to what might have happened in the future had the defendant not murdered the victim.

I respectfully dissent.